IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:                                         )
                                               )
REX JAMES MICHAEL DOTSON and                   )     Case No. 17-bk-877
AMY ELIZABETH DOTSON,                          )
                                               )
        Debtors.                               )     Chapter 7
                                               )

## MEMORANDUM OPINION

The Office of the United States Trustee (the "UST") seeks the dismissal of the bankruptcy case of Rex and Amy Dotson (the "Debtors") based on the totality of the Debtors' financial circumstances under § 707(b)(3) of the Bankruptcy Code.

The court will grant the UST's motion to dismiss under § 707(b)(3) for the reasons stated herein.

### I. BACKGROUND

The UST and the Debtors stipulated to a number of facts in connection with this matter. The court also draws several facts from the Debtors' schedules and the record as developed by the parties. The Debtors filed a voluntary Chapter 7 bankruptcy petition on August 31, 2017. According to the Debtors, their primary reason for filing was their inability to repay their debts and to prevent collection from two pending lawsuits. The Debtors are married with four dependent children, including twin three-year-old daughters, a five-year-old son, and a seven-year-old son. Mr. Dotson has been employed as Chief Marketing Officer with Odyssey Rehabilitation for eight years. His taxable gross income was $195,899 in 2015 and $171,955 in 2016.[1] Mrs. Dotson has not been employed outside the home since 2012. She asserts that she is now attempting to find employment and has completed four or five employment applications and received one telephone

---

[1] The annual median income for a family of six in West Virginia in the area where the Debtors reside is $88,199.

1

interview in the past year. She has also volunteered her time as a wedding planner for experience in hopes of one day operating her own business.

According to Schedules D and F, respectively, the Debtors listed secured debt of $379,399 and unsecured debt of $67,693, constituted by approximately $50,000 in credit card debt accumulated over the past three years for consumer purchases and $9,000 in medical expenses. The Debtors stopped using credit cards in 2016 and began paying for expenses with cash or cash equivalents. The Debtors live in a jointly-owned home valued at $370,000 in Fairmont, West Virginia. According to Schedule D, the Debtors' home is collateral for two deeds of trust held by Huntington Mortgage Company in the amounts of $245,365 and $85,150. The $85,150 deed of trust secured an equity line of credit in the same amount established by the Debtors in late 2014. The Debtors used those funds to make home improvements and consumer purchases and to repay outstanding debt.

According to Schedule I, the Debtors have a combined monthly gross income of $15,096 that nets $9,236 after accounting for taxes and other deductions. On Schedule J, the Debtors reported monthly expenses of $9,121, leaving a monthly net income of $115. Schedule J lists twenty-one monthly expenses, including, among other things: telephone, cell phone, internet, satellite, and cable services expenses of $420; food and housekeeping supplies expenses of $1,200; childcare and children's education expenses of $1,213; clothing, laundry, and dry cleaning costs of $200; medical and dental expenses of $749; transportation expenses (not including car payments) of $550; vehicle insurance payments of $310; two car payments of $566 and $889; and a payment of $45 for "brother's storage unit."[2] Notably absent from the Debtors' schedules are $455 per month in total payroll deductions related to Mr. Dotson's 401(k) account. Of the $455, $283 per month is to repay a $15,000 loan from Mr. Dotson's account taken in 2016 to pay living expenses and repay outstanding debt. The Debtors do not anticipate any changes in income, payroll deductions, or living expenses in the coming year. There is no presumption of abuse under § 707(b)(2) of the Bankruptcy Code.

## II. ANALYSIS

The UST argues that the totality of the Debtors' circumstances demonstrates abuse under § 707(b)(3)(B) based upon their ability to repay creditors and other factors indicating abuse.

---

[2] The Debtors eliminated this expense after filing their bankruptcy petition, but they did not amend their Schedule J to reflect this change in circumstances.

Specifically, the UST argues that if the court attributes the Debtors' storage expense, 401(k) loan repayment and contribution, and childcare expense as income, then the Debtors have an ability to repay creditors. The UST also argues that the Debtors filed due to an inability to pay consumer debts, incurred consumer purchases in excess of their ability to pay, submitted an excessive or unreasonable family budget, and submitted schedules that did not reasonably and accurately reflect their true financial condition. The UST does not assert that the Debtors filed their petition in bad faith.

The Debtors oppose dismissal for abuse based upon the totality of the circumstances. For instance, they assert that Mr. Dotson's 401(k) loan repayment and contribution are permissible deductions that were not taken on Schedule I (and are thus effectively included in the $115 calculation of disposable income), and that their childcare expense is necessary for Ms. Dotson's job search. The Debtors also assert that medical expenses motivated their filing, that their consumer purchases were within their ability to pay until they incurred such medical expenses, that their family budget is reasonable, and that their schedules are accurate and reasonable.

One of the key purposes of bankruptcy is to give an honest but unfortunate debtor a fresh start, but not a head start. *In re Sonntag*, No. 10-1749, 2012 WL 1065482, at *2 (Bankr. N.D.W. Va. Mar. 28, 2012) (citing *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007)). Thus, bankruptcy is both a mechanism for relief for a debtor and a debt collection tool for his or her creditors. *Id.* In 2005, Congress substantially amended the Bankruptcy Code "to ensure that debtors repay creditors the maximum they can afford." *Id.* (quoting Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), H.R. Rep. No. 109-31, pt. 1, at 2 (2005)). Among other things, BAPCPA changed the standard for dismissal from "substantial abuse" to mere "abuse," added § 702(b)(2) and (3), and changed the previous statutory presumption in favor of granting a debtor's discharge to a presumption against debtors who fail the means test. *Id.* Such changes were made largely to curb perceived abuses by Chapter 7 debtors who had the ability to repay their creditors. *Id.*

Section 707(b)(3)(B) codifies the totality of the circumstances test, which was previously the common law standard. *Id.* at *3. The UST has the burden of demonstrating that the totality of the Debtor's circumstances indicate abuse. *Id.* at *2. In *Green v. Staples*, the Fourth Circuit enumerated five factors it considered in evaluating the totality of the debtor's circumstances, which have remained informative post-BAPCPA. *Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th

3

Cir. 1991); *In re Cromwell*, No. 14-03707-5-SWH, 2015 WL 1119711, at *5 (Bankr. E.D.N.C. Mar. 6, 2015). These factors include: (1) whether the debtor filed the petition because of sudden illness, calamity, disability, or unemployment; (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay; (3) whether the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the debtor's true financial condition; and (5) whether the petition was filed in good faith. *Green*, 934 F.2d at 572. A debtor's ability to repay a significant portion of his or her unsecured, non-priority debt holds substantial weight in the court's determination of abuse under § 707(b)(3)(B). *Sonntag*, 2012 WL 1065482, at *4. The ability to repay creditors is generally evaluated by the amount the debtor could commit in a hypothetical Chapter 13 plan. *Id.* Post-petition changes to the debtor's financial circumstances, including future income, expenses, and financial intentions, are essential to determining the debtor's financial situation. *Id.* Furthermore, the accuracy of the Debtor's schedules is vital to the bankruptcy process. *Id.* at *7. The trustee and creditors should not have to "engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *Id.* (quoting *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987)).

  First, the UST asserts that the Debtors should remove, at the very least, their $45 storage expense because the Debtors no longer actually incur this expense. This would increase the Debtors' disposable income to $160. This alone would allow the Debtors to potentially pay $9,600, or 14% of their $67,693 in unsecured debts, to creditors over a 60-month period. The Debtors admit that they no longer pay for the storage unit, but they assert that the storage unit cost was accurate at the time of filing. The court will therefore consider the $45 storage expense as part of the Debtors' disposable income in determining their ability to pay creditors. "[W]hen a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Hamilton v. Lanning*, 560 U.S. 505, 524 (2010).

  Central to the UST's motion is his assertion that the Debtors have the ability to pay a significant portion of their debts in Chapter 13 or otherwise. For instance, the UST asserts that the Debtors' monthly childcare expense of $1,213 is unreasonable under the circumstances such that they should devote that amount to the repayment of their unsecured creditors. Specifically, the UST points to Ms. Dotson's inability, for whatever reason, to obtain employment. The Debtors

argue that the childcare expense is reasonable and necessary. Specifically, they note that no other adults reside in the home to care for the twin girls during the day if Ms. Dotson becomes employed, that Ms. Dotson is actively seeking employment and cannot search for employment, volunteer, or commence employment and care for the children full time, that it is difficult to find reliable childcare quickly in the event Ms. Dotson obtained employment, and that their daycare costs are less than other providers in the area.

Having reviewed the record, including the parties' stipulation and the UST's examination of the Debtor's under Fed. R. Bankr. P. 2004, the court finds the expense unreasonable under the circumstances such that it will include the $1,213 when determining the Debtor's ability to repay creditors. To be clear, the court sympathizes with the Debtors regarding the difficulty of finding reliable childcare quickly. The court therefore finds it reasonable for the Debtors to have utilized childcare when it became available in August 2016 so that Ms. Dotson could search for employment. However, her endeavor in that regard has not been fruitful. Ms. Dotson has been unemployed since 2012, has applied for only four to five jobs in the past year, and had one telephone interview. Moreover, the Debtors concede that Ms. Dotson would accept employment only if it was cost effective for their household. That is a decision many parents face, and the court finds no fault in that approach. It would make little sense for Ms. Dotson to accept employment if it would only further deteriorate the Debtors' financial health. Having said that, however, the court finds it indicative of abuse for the Debtors to spend $1,213 per month on childcare when Ms. Dotson is unemployed, has a notably limited history of seeking employment—with no offers in that regard, and will only return to work if it is cost effective for the household. At bottom, the court finds it more appropriate under the circumstances for Ms. Dotson to remain home with her twin daughters so that they Debtors can engage in additional belt tightening and save—or pay to their creditors if they want bankruptcy relief—the $1,213 they currently spend on childcare while Ms. Dotson is not working. *See Reed v. Anderson (In re Reed)*, 422 B.R. 214, 234 (C.D. Cal. 2009) (affirming the bankruptcy court's determination that the debtors' $333.66 monthly childcare expense was unreasonable when "Mrs. Reed had at least half a day to herself every day"). Having determined the unreasonableness of the Debtors' childcare expense, the court finds that eliminating that expense allows the Debtors to have the ability to repay at least $1,213 monthly to their unsecured creditors. In any event, the court gleans from the Rule 2004 examination transcript that the childcare expense will subside or disappear when the twin girls begin public school in two or

three years, making at least a portion of the $1,213 available for the repayment of unsecured creditors over the next sixty months—perhaps totaling as much as $29,112 to $43,668.

Finally, the UST contends that the Debtors have additional income in the form of 401(k) loan repayments and contributions that they could devote to the repayment of their unsecured creditors. Specifically, Mr. Dotson currently pays $283 monthly toward the repayment of a loan from his 401(k) and makes a monthly contribution of $172 to his account. The UST contends that such deductions from income are not generally permissible in an abuse inquiry and that making retirement contributions and repaying 401(k) loans are factors tending to show abuse. The UST therefore asserts that the Debtors have an additional $455 monthly to repay their unsecured creditors. The Debtors argue the exact opposite. They assert that such deductions are permissible in Chapter 13 and accounting for such deductions reduces their ability to repay creditors. In this case, the court finds the retirement contributions to be a bit of a red herring.

Pre-BAPCPA, repaying 401(k) loans, generally, and making retirement contributions, depending upon the circumstances of a given case, were factors tending to show abuse. *In re Lipford*, 397 B.R. 320, 330 (Bankr. M.D.N.C. 2008). Certain amendments to the Bankruptcy Code made by BAPCPA circumscribe this principle at least regarding a 401(k) loan repayment. 11 U.S.C. § 1322(f).[3] Although post-BAPCPA a debtor may deduct 401(k) loan repayments from disposable income, a debtor is required to redirect those funds to unsecured creditors once such loans have been repaid in a Chapter 13 plan. *Lipford*, 397 B.R. at 330. According to the UST's briefing, Mr. Dotson is scheduled to repay the loan on or before May 22, 2021, based upon Mr. Dotson's 401(k) loan documents. This date would be well within the 60-month period of a hypothetical Chapter 13 plan, thus giving the Chapter 13 trustee access to more disposable income to repay unsecured creditors after that date. For instance, if the Debtors converted this case to one under Chapter 13 in October 2018 and shortly thereafter obtained confirmation of a proposed plan that had a term of sixty months from November 2018, they may have as much as an additional $5,377[4] available to repay their unsecured creditors.

---

[3] Specifically, "[a] plan may not materially alter the terms of a loan described in [§] 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under [§] 1325." 11 U.S.C. § 1322(f).

[4] Based upon the court's calculation, May 2021 is 31 months from the hypothetical November 2018 effective date of the Debtors' Chapter 13 plan. That leaves 19 payments of $283 per month available for unsecured creditors (19*$283 = $5,377).

6

In conclusion, the court finds that the Debtors possess disposable income sufficient to fully repay their unsecured creditors, whose claims total $67,693, even permitting Mr. Dotson's 401(k) contribution and after deducting 10% from the Debtors' disposable income to account for administrative expenses in a prospective Chapter 13 case.  Specifically, the Debtors concede they have at least $160 available per month ($9,600 over 60 months), the court finds their $1,213 monthly childcare expense to be unreasonable ($72,780), and Mr. Dotson's loan repayment will make an additional $283 available every month beginning in June 2021 ($5,377).  The court therefore finds that the Debtors have a significant ability to repay.

The UST also argues that the *Green* factors weigh in favor of dismissing the Debtors' petition for abuse.  Specifically, the UST contends that: (1) the Debtors did not file their petition because of sudden illness, calamity, disability, or unemployment; (2) the Debtors incurred consumer purchases far in excess of their ability to repay; (3) the Debtors' proposed family budget is excessive or unreasonable; and (4) the Debtors' schedules and statement of current income and expenses do not reasonably and accurately reflect the Debtors' true financial condition.  *Green*, 934 F.2d at 572.  Notably, the UST does not dispute the fifth *Green* factor: whether the Debtors filed their petition in good faith.

The UST argues that the Debtors did not file because of sudden illness, calamity, disability, or unemployment because they have offered no evidence indicating that they filed bankruptcy for any reason other than an inability to repay their debts as they became due.  The UST also contends that the Debtors made consumer purchases far in excess of their ability to repay.  Specifically, the Debtors seemingly incurred most of their $50,000 in credit card debt within the three years before seeking bankruptcy relief, they also borrowed $85,000 on a line of credit secured by their home in 2014 for improvements and consumer purchases, and Mr. Dotson borrowed $15,000 from his 401(k) in 2016 for living expenses and repayment of outstanding debt.  Consequently, the Debtors have incurred over $150,000 in consumer debt in the past three years alone.

The UST also asserts that the third and fourth *Green* factors favor finding abuse here.  Specifically, the UST contends that Debtors' proposed family budget is excessive and that their schedules and statement of current income do not accurately reflect their true financial condition.  For instance, the UST argues that the Debtors' childcare expense is unreasonable and excessive.  Aside from that, however, the UST asserts that the Debtors' bank statements reflect purchases for food, housekeeping supplies, clothing and personal care of $3,522 per month, which is

significantly greater than the IRS allowance of $2,300 for that category of expenses.  The UST therefore asserts that the Debtors would benefit from belt tightening based upon their alleged excessive spending.  Specifically, the UST asserts that the Debtors' average monthly expenditures at stores where the Debtors primarily purchased clothing were $1,878 per month.  The Debtors dispute that but concede to spending at least $743 per month on clothing from January to October 2017, including stores such as Matilda Jane, Park & Madison, Victoria's Secret, Trunk Club, Stitch Fix, and Kid-Box.  Finally, the UST notes that the Debtors itemization on Schedule J for food, housekeeping supplies, clothing, and personal care expenses totaling $1,550 does not reasonably and accurately reflect their true financial condition.  Again, the UST contends that the Debtors' bank records reflect combined purchases for this expense category totaling an average of $3,522 per month from January 2017 to October 2017.  The Debtors filed their petition in August 2017.

The Debtors argue that their bankruptcy filing resulted from a combination of events, including illness.  One of the Debtors' daughters broke her arm, Mr. Dotson had three kidney stone incidents resulting in two emergency room visits, and Ms. Dotson has had chronic migraines, muscle issues, and blood work, all of which resulted in medical bills that hindered their ability to repay their consumer debt in a timely manner.  The Debtors also assert that their budget is not excessive or unreasonable and already reflects significant belt tightening.  The Debtors also argue that their schedules reasonably and accurately reflect their income and expenses, although the Debtors did not explicitly address the UST's assertion that their food, housekeeping supplies, clothing, and personal care expenses were nearly $2,000 higher than the reported amounts.

Here, the court finds that the totality of the circumstances, including the Debtors' ability to pay and the *Green* factors, weigh in favor of finding abuse.  Although the court sympathizes with the Debtors' recent medical issues, the Debtors reported health insurance costs of $1,137 per month on Schedule I that defray some of those costs.  More importantly, the court is not convinced that such costs were a significant factor causing the bankruptcy filing.  Though they may have been a contributing factor, the primary cause was excessive consumer spending.  It is important to note that, of the Debtors' reported, unsecured debts of $67,693, the Debtors admit that only about $9,000 of this amount is attributable to medical expenses.  Although this amount is significant on its own, it pales in comparison to the Debtors' consumer spending.  Moreover, it equates to roughly 4.6% of Mr. Dotson's 2015 salary of $195,899 or 5.2% of Mr. Dotson's 2016 salary of $171,955.  Although the Debtors attested that they have ceased using credit cards since 2016 and instead pay

in cash or from their bank account, the Debtors appear to have spent significant amounts on clothing alone in the months leading up to their bankruptcy.

The court finds persuasive the UST's argument regarding the third and fourth *Green* factors. First, the Debtors' childcare expense alone makes their family budget unreasonable based upon the court's analysis above. Moreover, the court finds that the evidence adduced in discovery here shows that the Debtor's spend excessively on food, housekeeping supplies, clothing, and personal care, particularly given their spending on clothing. The court recognizes the challenges the Debtors face with a family of six, but the court simply cannot countenance debtors obtaining Chapter 7 relief when they chose to finance excessive spending beyond their means. To find otherwise would be to thwart a primary goal of BAPCPA's consumer bankruptcy reforms—to "ensure that debtors who *can* pay creditors *do* pay them." *Ransom v. FIA Card Services, N.A.*, 561 U.S. 61, 64 (2011) (citation omitted). Finally, the court similarly finds that the evidence adduced by the UST supports a finding that the Debtors' schedules to not accurately reflect their financial circumstances. There is no doubt that the Debtors failed to disclose Mr. Dotson's 401(k) loan repayment and voluntary contribution as deductions from income on Schedule I. Also, the Debtors reported monthly expense of $1,550 for food, housekeeping supplies, clothing, and personal care appears to not accurately reflect their true expenditure in that regard based upon their bank account information.

### III. CONCLUSION

As a result, the court finds that the UST has met its burden to demonstrate that the Debtors' Chapter 7 petition should be dismissed under § 707(b)(3) based upon a totality of the circumstances.

The court will enter a separate order granting the UST's motion to dismiss. The Debtors will have thirty days from the entry of the order to convert their case to a proceeding under Chapter 13 or the court will enter a separate order dismissing the case.